[Civ. No. 4189. Fourth Dist. Dec. 6, 1951.]

CONSOLIDATED MORTGAGE COMPANY (a Corporation), Respondent, v. E. W. ROBERTS, Appellant.

Bodkin, Breslin & Luddy for Appellant.

Wellington & Sprague and Joseph T. Enright for Respondent.

MUSSELL, J.—Defendant appeals from a judgment for plaintiff in an unlawful detainer action involving a storeroom in Laguna Beach. Defendant occupied the premises from October 1, 1943 to September 30, 1948, as lessee under the terms of a written lease, which, by its terms and an extension thereof, expired on the last mentioned date. Defendant then refused to vacate, claiming that plaintiff had orally agreed to a renewal of the lease for an additional term. Plaintiff on October 2, 1948, commenced the present action and obtained a judgment for possession of the property, a termination of the lease, and damages in the sum of $156.25.

The principal and controlling question here is whether the lease was extended or renewed by the conversations and correspondence between the parties and their agents. We conclude that it was not and that the findings and judgment are sufficiently supported by the evidence.

Defendant bases his claim of a right to occupy the store room after the termination of the written lease upon two conversations had with one J. C. McCormick, who for several years prior to May 10, 1948, was general manager and secretary-treasurer of plaintiff corporation. The first of these conversations was by telephone ''in the early part of the summer of 1947,'' and defendant testified concerning it as follows:

''Q. Will you please relate that conversation?

''A. Yes. I called Mr. McCormick and I told him I had a party that was interested in buying the store and one of the things that was interesting them was the terms of the lease, and before they would pay the price I was asking, they would want assurance from him that the lease would be renewed for another term of five years. Shall I go on from there?

''Q. Yes, just give us the conversation.

''A. Mr. McCormick said he thought that would be all right, but the terms of a new lease would be up $25.00, or making it a hundred dollars, that he would have to take it up with one of the officers of the company, and that he would

like to see and approve of the people that were contemplating going in.''

The second conversation, according to defendant, occurred ''maybe sixty days later'' and was ''kind of a running conversation.'' Defendant testified that McCormick made the following statement:

''He said the president of the directors of the company had agreed to give me a new lease, and the terms of that would be that $25.00 he talked about, and he said they were cross with him and wanted to know if he was working for the tenant or working for them, and I told him at that time I would, as a means of appeasing their wrath, I would fix over the store, and that was the end of the conversation.

''Q. Did you have any further conversation with him regarding the lease to be effective after that particular term expired?

''A. No, except that he talked about other tenants' lights they were having to pay, and when he said he would get me the lease, I said it was a deal, and proceeded to fix the store up.''

McCormick testified relative to the first conversation as follows:

''I received a phone call from Mr. Roberts stating that he had a prospective buyer and wanted to know what our attitude would be as far as a new lease was concerned and, as I remember the conversation, I told him we would probably have no trouble with the new lease, but I wanted to meet his prospective buyers to see if we would pass on them or not.''

As to the second converation, Mr. McCormick testified:

''As I remember, Mr. Roberts asked me about a renewal of his lease and, as I remember, my reply was I would have to take it up with the Directors, and it would probably be an increase in rent. I can't remember whether he made the suggestion that it would be $25.00 more or whether I made it, and we entered into a further discussion as to a little difficulty I was having with the Board of Directors as far as increasing rents materially was concerned, and I said I had been through all that with the tenants for the most part and I wasn't in favor, knowing the business conditions more or less, of increasing it beyond the capacity of tenants to pay, and I also mentioned I had some little difficulty with the Board. I think I stated—I said they wanted to know if I was working for them or for the tenants, because I had been through all the business conditions. I told him I would have

to take it up with the Board of Directors as far as a new lease was concerned.

"Q. Was there anything said at that time by Mr. Roberts that he was going to do some improving on the store?

"A. He asked me if we had additional space, that he thought of going into additional businesses, or a new business in antiques, and at that time we had an additional space and I told him so.

"Q. And that is all that was said concerning any alterations at that time, is that correct?

"A. As far as I can remember, yes."

Evidence was introduced showing that defendant in 1948 had stated to one witness that he was going to get out of the store in September; that on three or four occasions in the fall of 1947 and again in the summer of 1948, defendant stated to his store manager that "He didn't know what he was going to do in regard to the store or the releasing of it. At one time he thought he might close it entirely and open in Palm Springs."

Evidence was received that Mr. Casteel, who succeeded Mr. McCormick as plaintiff's representative, met the defendant on August 6, 1948, at which time defendant stated that "he guessed" he would have to see him about a renewal of his lease; that Casteel then stated that on April 24, 1948, he had written a letter to defendant stating that he (Casteel) had been appointed general manager for plaintiff and that he was to be contacted regarding business matters; that not hearing from the defendant, he had rented the store on a five-year lease for $156.25 per month; that defendant then said "I guess that is it. I guess we will have to vacate"; that defendant then walked over to the store with Casteel, paid the August rent and stated to one of his employees "We are not going to get a new lease on the store. We will have to vacate on September 30."

By a letter dated September 8, 1948, defendant, through his attorneys, stated that he had been promised a new lease and that the terms and conditions "would be the same as the previous lease, with the exception that there might be an increase of not more than $25.00 a month." By letter dated September 20, 1948, demand was made by defendant for a lease for a term of five years at a rental of not more than $100 a month and by check dated October 1, 1948, defendant tendered the sum of $75 as rent for that month.

The trial court found, among other things, that the defendant and Mr. McCormick did not at any time discuss or agree upon the terms of a new lease or the exact amount of rental and neither understood or stated that a binding contract was entered into as a result of said conversation; that neither party intended or understood that the other should act or rely on said conversations and both understood that the same were negotiations only and that there would be no new lease until all of its terms and conditions were agreed upon and reduced to writing.

Whether the parties intended the conversations to constitute an agreement or whether they intended that no agreement should exist until their oral conversations were reduced to writing, and whether a contract was entered into, were questions of fact. Where, as here, there was a conflict in the evidence, the trial court's finding is binding upon us and the judgment cannot be disturbed.

The trial court further found that the defendant, believing the statements of Mr. McCormick and believing that said tenancy would probably be renewed upon the termination of the lease then in effect upon some terms and conditions not then fully discussed or understood, in the months of November and December, 1947, and January, 1948, had the premises repainted, repapered, a new carpet laid, new fixtures installed and had a balcony constructed; that the cost of said improvements, additions and renovations was $1,129.37, all of which was paid by defendant; that the plaintiff had no knowledge of said repairs and improvements being made until after they had been completed; that the said repairs were badly needed and necessary to keep the premises in good condition and repair and were, for the most part, necessary in order that the defendant could use the premises during the balance of the term of the lease.

Defendant contends that these findings establish an equitable estoppel defense to plaintiff's action in unlawful detainer and require a reversal of the judgment. [3] The existence of an estoppel is a question of fact. (*Parke* v. *Franciscus*, 194 Cal. 284, 297 [228 P. 435].)

In the instant case a reasonable inference to be drawn from the evidence was that plaintiff's agent, Mr. McCormick, did not intend that his conduct should be acted upon. The trial court expressly found that plaintiff had no knowledge of the repairs and improvements being made until after they were completed. The evidence supports the infer-

ence that defendant had no right under the circumstances to believe that McCormick intended his statements to be acted upon by defendant. ■ As was said in *Krobitzsch* v. *Middleton,* 72 Cal.App.2d 804, 815 [165 P.2d 729]:

" 'Unless but one inference can be drawn from the evidence, waiver and estoppel are questions for the jury or the trial court.' "

■ The defendant herein failed to prove the elements essential to the application of the equitable defense of estoppel. (*Bank of America* v. *Pacific Ready-Cut Homes,* 122 Cal. App. 554, 561 [10 P.2d 478].)

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.